BUSH INDUSTRIES, INC., Plaintiff,

v.

O'SULLIVAN INDUSTRIES, INC., Defendant.

O'SULLIVAN INDUSTRIES, INC., Counterclaimant,

v.

BUSH INDUSTRIES, INC., Counterdefendant.

Civ. A. No. 90–346–JRR.

United States District Court, D. Delaware.

Sept. 5, 1991.

Michael J. Hanrahan and Chandlee Johnson Kuhn of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del. (Stephen L. Peterson, Robert D. Litowitz and Barbara C. McCurdy of Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., of counsel), for Bush Industries, Inc.

Donald F. Parsons, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Albert J. Hillman, Roger L. Cook, Guy W. Chambers and David L. Bilsker of Townsend and Townsend, San Francisco, Cal., of counsel), for O'Sullivan Industries, Inc.

## OPINION

ROTH, Circuit Judge.[*]

This patent suit involves two manufacturers' designs for ready-to-assemble ("RTA") furniture in "traditional" styles. Bush Industries, Inc. ("Bush") filed this action against O'Sullivan Industries, Inc. ("O'Sullivan") alleging that O'Sullivan is infringing several of its design patents for various pieces of traditionally styled furniture. The patents-in-suit claim designs for an entertainment center, a TV/VCR cart, a desk, a hutch, and a printer stand. O'Sullivan has filed counterclaims alleging both that the Bush patents are not infringed and that they are invalid.

Presently before this Court is O'Sullivan's motion for summary judgment on grounds of non-infringement of the patents and of invalidity for obviousness. For the reasons stated below, we will grant O'Sullivan's motion on both grounds.

## I. FACTS

Both Bush and O'Sullivan manufacture RTA furniture. Unlike "setup" furniture, which is sold fully assembled, RTA furniture is sold in pieces with instructions and then assembled by the customer. RTA furniture is also typically constructed of particle board and laminate coatings rather than solid wood. For these reasons, RTA furniture is generally lower priced than setup pieces. Bush and O'Sullivan both sell several separate lines of RTA furniture, each of which contains a variety of matching pieces embodying a particular style. Among these lines, Bush has developed the JAMESTOWN Collection and O'Sullivan has created the RADFORD INN Collection, each of which contains pieces of RTA furniture in "traditional" styles. The designs for several of the pieces in Bush's JAMESTOWN Collection have been patented, and five of those design patents are the patents-in-suit in this action.

Each of Bush's patented designs was developed by its Chief Designer, Bruce Anderson, by applying traditional styling elements to pieces of RTA furniture. These traditional elements include dentil molding, solid raised panel doors, ogee shaped edges, and certain types of period hardware. As Bush admits, each individual traditional styling element was well

[*] At the time this case was briefed and argued, Judge Roth was a District Judge for the United States District Court for the District of Delaware. She presently serves on the United States Court of Appeals for the Third Circuit.

known in the art of furniture design. The asserted novelty of the Bush designs is in the particular arrangement of these elements in each piece of furniture. Bush first displayed its JAMESTOWN Collection in late 1987, and introduced the line in early 1988. Shortly thereafter, O'Sullivan brought out its RADFORD INN line.

Bush filed this action alleging that various items in the O'Sullivan RADFORD INN Collection infringe Bush's design patents. O'Sullivan has counterclaimed for a declaratory judgment that its furniture does not infringe the Bush patents and that the patents-in-suit are invalid for obviousness. Bush's initial complaint asserted that O'Sullivan had infringed six of its design patents: U.S. Patent No. 300,888 ('888) for an entertainment center design, U.S. Patent No. 301,095 ('095) claiming the design of another entertainment center, U.S. Patent No. 301,664 ('664) for a TV/VCR cart design, U.S. Patent No. 304,530 ('530) for a desk design, U.S. Patent No. 302,631 ('631) for the design of a hutch, and U.S. Patent No. 301,096 ('096) claiming a printer stand design. After briefing had been completed on O'Sullivan's summary judgment motion but before oral argument, Bush filed an amended complaint with O'Sullivan's consent pursuant to Fed. R.Civ.P. 15(a). The amended complaint deletes the count for infringement of the '095 entertainment center design patent. It also adds claims that O'Sullivan induced the infringement of the five remaining patents-in-suit through written assembly instructions which induced customers to complete infringing articles. However, given our conclusions below on the infringement issue, we need not separately address the inducing infringement theory.

As developed through discovery, the allegations of infringement under the amended complaint are as follows:

| PATENT | BUSH COMMERCIAL MODEL | ACCUSED O'SULLIVAN MODEL |
| --- | --- | --- |
| '888 | AV 763 Entertainment Center | 79782 Entertainment Center |
| | | 79718 Entertainment Center |
| | | 79719 Entertainment Center |
| '664 | V316 TV/VCR Cart | 74710 Utility Cart |
| '530 | CT254 Desk | 50712 Desk |
| '631 | CTA255 Hutch | 50717 Hutch |
| '096 | CT256 Printer Stand | 50714 Pinter Stand |

O'Sullivan's motion for summary judgment seeks a declaratory judgment of noninfringement and of invalidity for obviousness. We must therefore compare the Bush designs both to the accused O'Sullivan models and to the prior art. We are aided in this comparison by color pictures of the Bush commercial models, the O'Sullivan pieces, and relevant prior art designs, which O'Sullivan presented in its opening brief. We also had the opportunity at oral argument to view actual examples of several Bush commercial models and the corresponding accused O'Sullivan pieces.

A. *Comparison of the Bush designs with the accused O'Sullivan models*

Bush's allegations pair each of its designs with at least one accused infringing O'Sullivan model. Within each grouping, the pieces were developed for the same function, and in general, they have similar shapes and dimensions. In addition, each and every Bush and O'Sullivan model at issue in this case contains a strip of dentil molding, one of the many traditional styles of decorative molding, running just under the top edge of each piece. This type of molding is formed by a series of small, equally spaced, raised, rectangular blocks,

and comes in many varieties. Yet, having stated these similarities, our description below will focus on the differences among the pieces, because the purpose of the comparison is to determine whether the O'Sullivan pieces infringe the Bush design patents.

In making this comparison, we initially note that there are several distinguishing design features within all five groupings of patented and accused infringing designs. First, the top surface of each piece in the Bush designs and the O'Sullivan collection has an ogee edge, that is, an edge with an "S" shaped curve. In all the Bush designs, the ogee edge is used not only on the front of the piece, but also along the two sides. In the O'Sullivan models by contrast, the ogee edge only appears on the front. Second, all the Bush designs employ rails and/or pilasters, whereas none of the O'Sullivan furniture contains either. A rail is a separate horizontal piece which may run just under the top edge, along the bottom, or somewhere in between. A pilaster is a vertical piece, typically running along the side edge. Both rails and pilasters are used by furniture designers to create a fuller look. The fact that these features are employed only by Bush results in the Bush designs appearing more weighty and substantial than the O'Sullivan pieces. Third, Bush and O'Sullivan have chosen different styles of period hardware for use as door handles and drawer pulls. For door handles, Bush has typically employed solid scrolled backplates, whereas O'Sullivan has used pierced backplates. Similarly, while Bush has used drop bail pulls with twin backs for its drawers, O'Sullivan has employed single solid scrolled backplates.

Beyond these overall differences, there are further dissimilarities within each grouping of Bush designs and corresponding accused O'Sullivan models. We shall describe these in turn for each patent-in-suit, commencing with the '888 patent. This patent claims a design for an entertainment center, which is commercially embodied in Bush's model AV 763. The left side of the piece resembles a bookcase, containing five shelves, and is covered by two vertical framed glass doors. More specifically, each of these doors covers half the width of the shelves, and is surrounded by a wood laminate frame. On the right

side of the entertainment center is an opening for a television, with a VCR shelf above and two solid raised panel doors below. The raised panels are achieved by placing a rectangular border around the edge of each door and a separate panel in the middle, thereby creating a channel around the central panel. The design also incorporates dentil molding beneath the top edge of the piece, period hardware, and rails and pilasters. Bush has accused three O'Sullivan entertainment centers of infringing this design patent.

O'Sullivan's 79782 model entertainment center most closely resembles the Bush design. The right half of this piece displays the same layout as the Bush model, and differs solely in the extent of the ogee edge, use of hardware, and absence of rails and pilasters as discussed above. On the left side of the piece, the O'Sullivan model also differs in that its five shelves are covered by only a single framed glass door. Thus, in contrast to the Bush design in which two vertical pieces of wood laminate frame the two separate doors and run down the center of the shelves, in the O'Sullivan 79782 entertainment center the shelves are completely visible.

The O'Sullivan model 79719 displays further features which distinguish it from the Bush design. Most noticeably, unlike the Bush design and the O'Sullivan model 79782, the right half of the model 79719 does not contain a VCR shelf over the television cavity. In addition, the left side of this piece has no door at all covering its five shelves. Finally, the third design accused of infringing the '888 patent is O'Sullivan's 79718 entertainment center. Like the 79719 model, it also lacks a VCR shelf on the right side of the piece. As for the left side, it employs two *un* framed vertical glass doors, which only run approximately halfway down from the top of the piece. Thus, as with all the accused O'Sullivan models, it lacks the two strips of wood laminate running down the center of the shelves as frames for the glass doors.

Bush's '664 patent claims a design for a TV/VCR cart as embodied in its V316 TV/VCR cart. The structure of the cart re-

sembles a small, two shelf bookcase. The top "shelf" is smaller and serves as the cavity for the VCR. The larger bottom shelf is covered by two solid raised panel doors. The television would be placed on top of the piece. The cart sits atop four coaster wheels, which are not visible from the front of the piece. In addition, like all the Bush patents-in-suit, this Bush design employs dentil molding beneath the top edge of the piece, and it contains rails and pilasters along three sides of the VCR cavity.

The O'Sullivan model accused of infringing this design is the 74710 utility cart. This piece has the same structure as the Bush design, except that on the O'Sullivan model the coaster wheels are visible. Beyond this, the differences between the carts are the overall dissimilarities discussed above. That is, the O'Sullivan design contains no rails or pilasters, has an ogee edge on the front only, and employs different hardware for its door handles. Of all the O'Sullivan models, the utility cart most closely resembles the particular Bush design that it is alleged to infringe.

The Bush '530 patent is commercially developed in Bush's CT254 desk. The desk has two righthand drawers with shaped edges, the lower of which does not extend to floor level. The design also employs a modesty panel, which is a wide board across the back of the desk extending down from the desk top to a level even with the bottom of the lower drawer. Finally, the piece includes rails and pilasters, and under the edge of the desk top is a strip of dentil molding.

The accused O'Sullivan model is its 50712 desk. The layout of the desk is identical to that of the Bush design, including two drawers on the right and a modesty panel. The drawers, however, do not simply have shaped edges but are framed, so that the center rectangular panel of each surface appears to be recessed. In addition, the piece displays the overall distinctions of lacking rails and pilasters, using different hardware for the drawer pulls, and employing an ogee edge only on the front.

Bush's '631 patent design is represented in its CTA255 hutch, which is intended to sit atop the CT254 desk. The left side of the hutch contains two shelves, with the bottom one formed by the desk top. The picture of the commercial CTA255 desk depicts the hutch with a computer monitor on the top shelf and a hard disk drive on the lower shelf. On the right side of the piece are also two shelves with the bottom one formed by the desk top, while the top shelf is enclosed by two solid doors with shaped edges. The hutch also contains rails and pilasters and a row of dentil molding beneath the top edge.

This design is allegedly infringed by O'Sullivan's 50717 model hutch. As in the Bush design, the left side of this hutch also contains two shelves partly formed by the desk top, and, like the Bush commercial model, is portrayed with a computer monitor and hard disk drive occupying these shelves. The right side of the hutch, however, has three open shelves. There are no doors, solid or otherwise, on the O'Sullivan hutch. The pieces also differ, of course, in the absence of rails or pilasters or a full ogee edge on the O'Sullivan model.

The final Bush patent-in-suit is the '096 patent. Its design is embodied in Bush's CT256 printer stand. As with the TV/VCR cart, the basic structure of this design is that of a small two shelf bookcase. On the printer stand, both shelves are open in the front, and each is also partially open at back to permit the flow of computer paper. The lower shelf of the piece rests at floor level, and the upper shelf is placed approximately at the midpoint of the piece. The design includes the usual dentil molding, rails, and pilasters.

The accused O'Sullivan piece is its 50714 printer stand. This model also resembles a small two shelf bookcase with shelves that are open in front and partially open in back. The shelf placement, however, differs from the Bush design in that the lower shelf is well above floor level. In addition, because the two printer stands were two of the pieces we viewed at oral argument, we were able to observe that the dimensions and proportions of the two models are dissimilar. Lastly, as with all the accused O'Sullivan furniture, the O'Sullivan printer

stand has an ogee edge only on the front and does not include any rails or pilasters.

### B. *Comparison of the Bush designs with the prior art models*

As the parties agree, the relevant prior art for the Bush patents-in-suit includes designs for setup furniture as well as those for RTA pieces. Within this realm there are vast numbers of different models for each of the types of home and office furniture at issue in this action. We have reviewed several catalogues of designs. As we have already noted, it is undisputed that each and every individual feature employed in the Bush designs can be found somewhere in the prior art. The question for our determination is how closely do the particular combinations in the Bush designs approximate the arrangements of these elements in specific prior art examples. Consequently, in comparing each Bush patent to the prior art, we shall focus on the few models that the Bush designs most closely resemble. We note, however, that several of the prior art examples that most closely resemble each design, namely the Riverside 5132 entertainment center, the Hooker and Peters–Revington TV/VCR carts, and the Singer E453–865 computer desk/hutch, were not presented to or reviewed by the Patent and Trademark Office when it considered Bush's applications.

Bush's '888 patent entertainment center design may be compared with three prior art examples. Two of these examples employ layouts virtually identical to the Bush design without using traditional styling, while the third displays a similar layout and many traditional design features. L & B Wood Specialties, Corp.'s entertainment center model no. 5532–3, which was introduced as early as 1983, (D.I. 37, Ex. 2), displays an exact mirror image of the Bush layout: the shelves with two vertical framed glass doors are on the right side of the piece, and the television cavity, VCR shelf, and solid doors are on the left. The Best Distributors model 1930 entertainment center, also from 1983, employs the same left/right orientation as the Bush model, although it lacks any VCR shelf over the television cavity on the right side.

In addition, the two vertical glass doors covering the shelves on the left side of the Best Distributors model are unframed.

The third prior art example is the Riverside 5132 entertainment center, a setup piece from 1985, which demonstrates the use of traditional styling on an entertainment center intended for modern day use. This design includes two solid raised panel doors with period hardware for door handles, and two vertical framed glass doors. It also employs a strip of dentil molding just beneath the top edge of the piece. The wood frames for the glass doors are, however, arched, and thus more elaborate than the simple rectangular frames on the doors of the Bush design. The layout of the Riverside entertainment center is similar to the Bush design, although not as close as those of the L & B and Best Distributors pieces. More specifically, the Riverside model does include a VCR shelf on the right side over the television cavity, but beneath the television are three drawers rather than two solid doors. The shelves on the left side of the piece are covered by two vertical framed glass doors, but these shelves and doors extend only halfway down from the top. Beneath these shelves are the two solid raised panel doors.

Two prior art examples most closely approximate the Bush '664 patent TV/VCR cart design. Having reviewed several furniture catalogues, we can confidently state that, unlike entertainment centers, TV/VCR carts vary little in their structure and layout. Among the many carts that are composed of a VCR cavity over a shelf enclosed by two solid doors, are at least two setup models employing traditional styling elements. These are the Hooker 010–55–000 entertainment center developed in 1985 and the Peters–Revington A.V.S. 10075 Entertainment Chest from 1987. The layouts of both pieces are identical to that of the Bush design except that neither example has coaster wheels, a feature stemming from other lower priced prior art examples. In addition, both setup pieces contain a strip of dentil molding just beneath the top edge, both employ rails, and both have solid paneled doors.

There are only a few differences between the Hooker and Peters–Revington designs on the one hand and the Bush patented design on the other. More specifically, the Hooker cart has recessed rather than raised panels on its doors; the panels on both the Hooker and the Peters–Revington pieces' doors are arched rather than rectangular; the Hooker piece employs an arched rail at the top of the VCR cavity; and the Peters–Revington design contains a cut out or shaped base rather than a straight one. Thus, while we noted above that of all the models at issue in this action, the O'Sullivan utility cart most closely approximates the Bush patent design which it is alleged to infringe, it is also the case that the Bush TV/VCR cart design most closely resembles the relevant prior art.

The prior art comparison for the Bush '530 desk design patent reveals at least one model with no traditional styling but an identical layout, and a second piece employing traditional styling elements and a similar layout. The identical layout is represented in the desk from the O'Sullivan CT710 computer workstation of 1982; like the Bush design it contains two righthand drawers above floor level and a modesty panel. The application of traditional styling elements is found in the Singer E453–865 computer desk/hutch combination from 1983. The Singer design includes traditional period hardware, a drawer with shaped edges, and dentil molding.

Bush's '631 hutch and '096 printer stand patent designs may be compared to the same two prior art examples as the desk design. First, the hutch portion of the Singer E453–865 computer desk/hutch combination is similar in both layout and use of traditional styling to the Bush '631 patent design. Both hutches contain two shelves on each side with the lower shelves formed by the desk top, and both have a strip of dentil molding just beneath the top edge. Thus, were one to add two solid doors to enclose the upper righthand shelf of the hutch portion of the Singer unit, the result would closely resemble the Bush design. The only remaining difference is that the side panels of the Singer hutch are not rectangular; on each side panel of the

Singer hutch the front edge curves and tapers back so that the side panel is wider at the base of the hutch than at the top.

As for Bush's printer stand design, its layout is similar to that of the printer stand portion of the O'Sullivan CT710 computer workstation. Although the earlier O'Sullivan piece contains three shelves to Bush's two, the lowest shelves of both stands are at floor level. In addition, the photo of the Singer computer desk/hutch depicts that unit containing not only a computer on its lefthand shelves, but also a printer on its lower righthand shelf; thus, the Singer model also constitutes prior art for the use of dentil molding on a printer stand.

## II. DISCUSSION

 The legal standards for deciding a motion for summary judgment in a patent case are the same as the summary judgment standards in any other civil action. Pursuant to Fed.R.Civ.P. 56, the moving party must demonstrate that there are no genuine issues of material fact and that the movant is entitled to a judgment as a matter of law. A dispute is genuine only if there is sufficient evidence so that a rational trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In making this inquiry we must apply the burden of proof required by the underlying substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). If the non-moving party will bear the burden of proof at trial, to defeat summary judgment, that party must designate specific facts in the record demonstrating that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### A. Infringement

 A patent holder bears the burden of proving infringement by a preponderance of the evidence. *Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1187 (Fed.Cir. 1988). To prove infringement of a design

patent, the patent holder must establish two elements. First, it must show that " 'in the eye of an ordinary observer giving such attention as a purchaser usually gives, [the] two designs are substantially the same [and] the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other,' " *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1565 (Fed.Cir.1988) (quoting *Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 528, 20 L.Ed. 731 (1871)). Second, the patent holder must prove that the accused infringing design appropriates the point of novelty in the patented design that distinguishes the design from the prior art. *Id.* In the present case, Bush cannot meet either of the two prongs of the infringement test.

### 1. Ordinary Observer Test

■ Under the ordinary observer element of the infringement test, O'Sullivan has proffered the pictures of the various patented and accused designs as well as the declaration of its expert furniture designer, Robert E. Stannard. Stannard states that in his opinion, there are numerous and significant differences between the Bush patented designs and the accused O'Sullivan designs. (D.I. 19B, Ex. 31 at A389–A393). In opposition, Bush has presented the affidavit of its expert, Arto Szabo, who asserts that an ordinary observer giving the attention of a purchaser "would easily confuse" the two models in each pair of designs. (D.I. 29A, Ex. 13 at A120–A123).

Having reviewed these materials, we find that the pictures provide the most compelling evidence for our analysis under the ordinary observer test. As Bush correctly points out, the declaration of O'Sullivan's expert, Stannard, does not present the viewpoint of an ordinary observer. Similarly, while Bush's expert, Szabo, attempted to provide the viewpoint of an ordinary observer, his affidavit was based on his opinion of what an ordinary observer would notice, and not on personal knowledge of consumers' perceptions. Szabo testified at his deposition that he has never been to a showroom in which Bush and O'Sullivan models were displayed, and he has not conducted any surveys or even spoken to any customers. (D.I. 37, Ex. 1 at A7–A15, A107–A108, A134–A135). Moreover, in his deposition, Szabo admitted his belief that if the two models in each pair were placed side by side, the ordinary observer would notice differences. He had simply assumed for purposes of his affidavit that the models would be on opposite ends of a showroom, and concluded that observers would forget the differences while walking from one model to the other. (D.I. 37, Ex. 1 at A94–A106).

Yet, expert testimony is unnecessary under the ordinary observer prong of the infringement test. Having personally examined Bush's patents, the pictures of the commercial pieces, and several actual models at oral argument, we find that there are numerous differences within each grouping of Bush and O'Sullivan designs that would be noticed by an ordinary observer paying such attention as would a purchaser, and that consequently the ordinary observer would not be confused. We have already described in some detail the various differences that we noticed. We now set forth those distinctions that compel our conclusion that a rational trier of fact could only find that an ordinary observer would not be confused.

Under the '888 patent design for the entertainment center, the key distinguishing feature is Bush's use of *two framed* vertical glass doors to cover all the shelves on the left side of the piece. The principal significance of this feature is that the ordinary observer's view of the shelves is obstructed in part by two vertical strips of wood laminate running down the shelves' center. Not one of the accused O'Sullivan entertainment centers shares this very noticeable feature: the 79782 model contains only one framed glass door so the frame is only at the border, the 79719 version has no door over the shelves, and the 79718 model has two *un*framed glass doors which do not even extend to the bottom of the piece.

In addition, two of the accused O'Sullivan entertainment centers, the 79719 and 79718 models, lack any VCR shelf over the

television cavity. Not only is this absence visibly obvious, but a consumer "giving such attention as a purchaser usually gives" is likely to notice whether an entertainment center provides a space over the television for a VCR. Lastly, while the ordinary observer may not notice whether the ogee edge continues around the sides of an entertainment center, and may or may not notice the difference in hardware, he or she would notice that the rails and pilasters in the Bush design provide a fuller and more substantial look than that of any of the three accused O'Sullivan models.

The '664 patent design for the TV/VCR cart provides the closest case for infringement under the ordinary observer prong of the test, yet, here too, the ordinary observer would not be confused. The most conspicuous difference between this design and that of the allegedly infringing O'Sullivan 74710 utility cart is that only the Bush design includes rails and pilasters around the VCR cavity. This distinction renders the Bush piece more full-bodied in appearance. Another result is that the VCR cavity in the Bush design appears smaller relative to the size of the cart as a whole than does the VCR opening in the O'Sullivan cart. In addition, the coaster wheels are hidden on the Bush design, but visible from the front of the O'Sullivan piece. Finally, to the extent that our conclusion with respect to this pair of designs is less firm than that for other groupings, we note that this disparity is more than counterbalanced by our strong findings below that the '664 patent is not infringed under the second prong of the test.

Turning to the desk designs, we find that an ordinary observer would have little difficulty in noticing the differences between the Bush '530 patent desk design and the accused O'Sullivan 50712 desk design. First and foremost, the drawers of these two pieces are quite dissimilar. Whereas the Bush design employs only subtle shaped edges for its drawers, the O'Sullivan piece contains widely framed drawers with recessed inner panels. In addition, the general absence of rails and pilasters in O'Sullivan's designs is particularly apparent in the desk; since no drawers, doors, or

shelves are attached to the desk's left side panel or top surface as would be the case with an entertainment center, these appear as thin, unadorned planks.

Bush's design for its CTA255 hutch, as claimed in the '631 patent, is the one which most visibly differs from its accused O'Sullivan counterpart. Simply stated, the Bush design includes two solid doors enclosing one of the hutch's four shelves, whereas the allegedly infringing O'Sullivan 50717 hutch contains no doors at all. We find that an ordinary observer would have no trouble noticing the contrast between the enclosed top righthand shelf on the Bush piece and the open corresponding shelf on the O'Sullivan model.

Lastly, Bush's '096 patent design for the printer stand, differs noticeably from the accused O'Sullivan 50714 printer stand design. Most significantly, the lower shelf of the Bush printer stand is at floor level, whereas the bottom shelf in the O'Sullivan piece is considerably above the ground. Moreover, although we realize that the relevant comparison for the accused O'Sullivan stand is with the Bush patent design, and not with the Bush commercial model, *cf. In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir.1988) (design patents have almost no scope; the claim is limited to what is shown in the drawings), because of the similarity between the '096 patent and the Bush CT 256 printer stand, such a comparison of commercial models is helpful. *See Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1189 (Fed.Cir.1988). Having viewed the Bush and O'Sullivan commercial models side by side in the courtroom at oral argument, we observed the striking differences in their proportions and dimensions. We consequently conclude that an ordinary purchaser would not be deceived into buying one believing it to be the other.

Thus, we find that "in the eye of an ordinary observer, giving such attention as a purchaser usually gives," none of the accused O'Sullivan models are substantially the same as the Bush designs which they are alleged to infringe.

### 2. Point of Novelty Test

As stated above, under this element of the design patent infringement test, the patent holder must demonstrate that the very point of novelty which distinguishes the patented design from the prior art, is contained in the allegedly infringing design. *Avia*, 853 F.2d at 1565. Bush faces two serious barriers in meeting this test. Most importantly, we can discern no point of novelty in the Bush designs in the first place. In addition, to the extent that the Bush designs might be considered to be new, the novel elements are not found in the O'Sullivan furniture designs.

Under this test, a design's point of novelty need not be one individual newly developed feature, and may instead be a specific combination of elements not found in the prior art. *See Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1444 (Fed.Cir.1984). The inquiry, however, must focus on the specific aspects of a design, the combination of which makes it new. Moreover, in focusing on these aspects which create the novelty of the design, the "overall appearance" of a design cannot be considered to constitute a point of novelty. *Winner Int'l Corp. v. Wolo Mfg. Corp.*, 905 F.2d 375, 376 (Fed.Cir.1990).

Bush has attempted to define the point of novelty of its designs as a combination of features under *Litton.* In its answering brief, Bush claimed that the point of novelty in its designs is "the arrangement of elements, i.e., how those elements relate to one another spatially." Answering Brief at 28. In its interrogatory responses, Bush asserted that the point of novelty of its patented designs is "the combination of traditional design features, including dentil molding, traditional hardware, and, in certain instances, rectilinear raised panel doors, to create specific items of furniture having architecturally pleasing proportions and traditional styling." (D.I. 19B, Ex. 34 at A440). At oral argument, Bush's counsel contended that the "combination of elements" in each piece provides the point of novelty. Transcript (D.I. 45), at 37. As an example, he stated that in the '888 patent for an entertainment center design the point of novelty is the particular layout combined with dentil molding. *Id.* at 40.

We find that Bush's formulations of the points of novelty in its designs are not only vague but also slippery. Every combination Bush has identified has been entirely malleable. The most obvious example is provided by the '888 patent. Bush had originally stated in its answering brief that the point of novelty of this entertainment center design was the layout, which it described as the combination of a series of visible shelves down the entire left side of the unit together with the use of two doors just below an opening for a television on the right side. When O'Sullivan presented pictures of the L & B Wood Specialties and Best Distributors entertainment centers, which as described above, display this layout, Bush simply revised its statement of the point of novelty to include dentil molding. Indeed, Bush's counsel admitted as much at oral argument, saying "if they find more prior art, we will change the point of novelty again." *Id.* at 42.

What troubles us about this approach is not simply the fact that Bush revised its statement upon being confronted with an additional prior art example. We agree that there might be a situation in which patent holder could reasonably make such a revision in its statement of the design's point of novelty. For example, were a patented design formed by uniting a vast variety of features no two of which had ever before been paired, and the patent holder later discovered that two of the features had appeared together in a prior art example, the combination of the remaining large array of previously unjoined elements would still be sufficient as a point of novelty.

Yet, that is not this case. Not only are the features distinguishing the Bush designs from the prior art far less substantial than those in our hypothetical, but from the outset Bush has adopted a definition of point of novelty which can never be pinned down. Accepting for the moment Bush's contention that a statement of the point of novelty should not "be frozen in time," *id.* at 42, neither should it be completely liquid.

Even more importantly, there is a fundamental flaw in Bush's approach to making the initial identification of a design's point of novelty. Bush contends that the point of novelty in a design should not be defined simply by comparing the patent to the prior art, but also by comparing the patented design to the accused infringing design. Under this version of the inquiry, as Bush's counsel stated at oral argument:

> [T]he point of novelty is, are those elements present in the infringing design? Are they present in the prior art? Are they present in the claim design? ... My goal is to make the scope of the patent equivalent to the scope of what we want to enforce. We want to encompass their designs without encompassing the prior art, and that's all.

*Id.* at 41–42. Thus, rather than first comparing the patented design to the prior art to determine what the point of novelty is and then reviewing the accused design to assess whether it includes this particular combination of elements, under Bush's approach we would simply examine whether we can create a list of features common to the patented and accused designs that are not all found together in any single prior art example.

O'Sullivan has referred to this approach as the laundry list method. We prefer to term it the shopping list approach, since a shopping list will be rewritten for each trip depending on what the shopper needs at the time. In any event, whatever name we apply, we find that Bush's analysis is fundamentally at odds with that of the Federal Circuit in *Litton,* 728 F.2d at 1444, and that Bush's method would undermine the function of the point of novelty test. The design patent at issue in *Litton* claimed a design for a microwave oven. The Federal Circuit held that the point of novelty in the design was "the combination on a microwave oven's exterior of a three-stripe door frame, a door without a handle, and a latch release lever on the control panel." *Id.* The court based this conclusion on its "analysis in the previous section" of the

opinion, which compared the patented design to the prior art. *Id.* Only after identifying the point of novelty did the court compare the patented design to the accused design.

Moreover, in refusing to consider the overall appearance of a design as a point of novelty in *Winner Int'l Corp. v. Wolo Mfg. Corp.,* 905 F.2d 375, 376 (Fed. Cir.1990), the Federal Circuit stated that this approach "would eviscerate the purpose of the 'point of novelty' approach, which is to focus on those aspects of a design which render the design different from prior art designs." While we accept Bush's argument that it is not advocating the overall appearance approach rejected in *Winner,* we find that Bush's method would have a similar effect. Bush contends that of all the features which combine to distinguish a design from the prior art, we should only consider those which also appear in the accused design. This is not the function of the point of novelty infringement test.

When we properly apply the point of novelty test as set forth in *Litton* and *Winner* to the Bush patents, we have difficulty identifying any points of novelty.[1] As indicated in the facts section above, each and every layout displayed in the Bush design patents can be found in at least one prior art example. Nor was Bush the first to apply traditional styling to modern day pieces such as entertainment centers and computer desks. Thus, we must conduct our inquiry at a more detailed level, examining the variety of individual styling elements and the multitude of prior combinations to determine which, if any, groupings of features are unique to the Bush designs.

For some of the Bush designs this task proves virtually impossible. The most difficult case is Bush's '664 patent design which is embodied in the commercial V316 TV/VCR cart. As we have stated above, when comparing this design to the prior art, except for Bush's addition of coaster wheels, the layout of the Bush design is

---

1. The lack of novelty in any combinations we are able to identify is discussed more fully below under our analysis of the obviousness of the designs.

identical to those of two traditionally styled prior art examples, the Hooker 010–55–000 entertainment center and the Peters–Revington A.V.S. 10075 entertainment chest. Moreover, the Hooker and Peters–Revington models both contain such traditional styling features as dentil molding, rails, and solid paneled doors. We find neither the specific features of the Bush TV/VCR cart design, nor the combination of these features to be a point of novelty.

Finally, even assuming that it is possible to isolate a combination of features in each design that qualifies as a point of novelty, any such points of novelty must include elements that are absent from the O'Sullivan models. For example, the most apparent feature differentiating the Bush '631 hutch design from the hutch portion of the prior art Singer E453–865 computer desk/ hutch, is Bush's addition of two solid doors enclosing one of the four shelves. Such doors, however, are also absent from the accused O'Sullivan 50717 hutch. Similarly, any description of the combination of elements found in the '888 entertainment center design, must include the two vertical framed glass doors, yet these cannot be found in any of the accused O'Sullivan models. Lastly, as a general example, any list of features distinguishing a given Bush design from the relevant prior art would include Bush's particular use of rails and pilasters, but none of the accused O'Sullivan pieces contain any of either.

### 3. Conclusion on Infringement

Thus, we find that as to each of the five patents-in-suit, Bush has not demonstrated the existence of any genuine issues of fact under either element of the two pronged test for infringement. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). We note further that our separate conclusions under the ordinary observer and point of novelty aspects of the test have a synergistic effect. That is, when we compare the differences between the patented and accused designs with those between the Bush patents and the prior art, it further reinforces our conclusion that the Bush patents are not infringed. As the Federal Circuit has stated:

> We recognize that minor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement. In this case, however, "while there is some similarity between the patented and alleged infringing designs, which without consideration of the prior art might seem important, yet such similarity as is due to common external configuration is no greater, if as great, between the patented and challenged designs as between the former and the designs of the prior art."

*Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1444 (Fed.Cir.1984) (quoting *Applied Arts Corp. v. Grand Rapids Metalcraft Corp.,* 67 F.2d 428, 430 (6th Cir. 1933)).

### B. *Invalidity for obviousness*

■ All patents are presumed valid under 35 U.S.C. § 282 (1988), and one who challenges the validity of a patent bears the burden of rebutting this presumption and proving invalidity by clear and convincing evidence. *Tillotson, Ltd. v. Walbro Corp.,* 831 F.2d 1033, 1036 (Fed.Cir.1987). In the present case, O'Sullivan attacks the validity of the Bush patents on the grounds of obviousness. Like utility patents, design patents must meet the non-obvious requirement of 35 U.S.C. § 103 (1988). *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1563 (Fed.Cir. 1988).

■ In assessing whether a patent is invalid for obviousness under 35 U.S.C. § 103 (1988), a court must consider four factors: the scope and content of the prior art; the differences between the prior art and the patent in suit; the level of ordinary skill in the art at the time of the invention; and secondary considerations such as commercial success or copying. *Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1441 (Fed.Cir.1984). For a design patent, the hypothetical person of ordinary skill in the art under the third factor is " 'the designer of ordinary capability who

designs articles of the type presented.'" *Avia*, 853 F.2d at 1564 (citation omitted).

Under the fourth factor of the obviousness test, evidence of secondary considerations, when presented, must be evaluated in assessing obviousness. *Stratoflex, Inc. v. Aeroquip Corp.* 713 F.2d 1530, 1538–39 (Fed.Cir.1983). This mandate results from the Federal Circuit's conclusion that such evidence "may often be the most probative and cogent evidence in the record [and] may often establish that an invention appearing to have been obvious in light of the prior art was not." *Id.* at 1538. In reliance on this requirement, Bush has focused almost exclusively on secondary considerations to counter O'Sullivan's assertion that all the patents-in-suit are invalid for obviousness.

Under the three primary factors of the obviousness analysis, we have already described at some length both the scope and content of the prior art and the observable differences between the prior art and the design patents-in-suit. Our present task is to determine whether the changes made by the Bush designs would have been obvious at the time to the ordinary designer who designs furniture of this type. Following this inquiry, we must then examine the applicable secondary considerations, namely the evidence of commercial success and copying.

### 1. Comparison to the Prior Art

In support of its obviousness argument, O'Sullivan presents the declaration of its expert furniture designer, Robert E. Stannard, who designs furniture of the type at issue in this case. In his declaration, Stannard states his conclusion that in 1987, given the traditional designs already in existence, each of the Bush designs, when taken as a whole, would have been obvious to a furniture designer of ordinary capability. While Stannard's use of the word "obvious" has no legal significance, his statements in support of this conclusion are noteworthy.

Stannard states that "[t]he basic traditional motif used throughout Bush's patented designs of dentil molding, doors with shaped edges, framed raised panel doors, rails, pilasters and period hardware is a common, typical and expected way of trying to achieve a 'traditional look' within Bush's price range and manufacturing limitations." (D.I. 19B, Ex. 31 at A388). He further asserts that the Bush designs employ each of these traditional styling elements in precisely the way in which they are supposed to be used, for example, by placing dentil molding just below the top edge of each piece. Stannard therefore concludes that the Bush designs "consist simply of applying a popular traditional motif to standard shell structures of entertainment centers, TV/VCR carts, desks, hutches and printer stands in the manner one would expect." (D.I. 19B, Ex. 31 at A389).

Beyond asserting that the combinations of features in its patented designs are novel, Bush essentially opposes O'Sullivan's obviousness argument, by attacking Stannard's declaration. While O'Sullivan bears the burden of proving obviousness, and "an expert's opinion on the legal conclusion of obviousness is neither necessary nor controlling," *Avia*, 853 F.2d at 1564, it is interesting to note that Bush's expert, Arto Szabo, does not address the obviousness issue at all in his affidavit. Bush asserts that Stannard's declaration is not credible, because Stannard considered all six patents together, and because in his deposition, he retracted a number of factual assertions as overbroad or incorrect. While Bush is correct that Stannard amended some of his responses at his deposition, the nature of the retractions was, for example, to change a statement that Bush used the *"easiest* way to make a door look traditional" to one that Bush used *"an easy* way." Such retractions do not negate the inference of obviousness.

Having personally compared the patents-in-suit to the prior art as set forth at length above, we agree with Stannard that the Bush designs consist of predictable applications of traditional styling elements to standard shell structures for various pieces of home and office furniture. More specifically, the entertainment center design claimed in the '888 patent is composed by

applying traditional styling features, as demonstrated in the setup Riverside 5132 entertainment center, to the shell layout of the L & B Wood Specialties, Corp.'s 5532–3 entertainment center. Similarly, Bush's desk design as claimed in the '631 patent, is a straightforward combination of the traditional design elements of the Singer E453–865 computer desk/hutch with the shell structure of the desk in O'Sullivan's CT710 computer workstation.

Bush's '664 patented design for a TV/VCR cart is even more clearly anticipated by the prior art; the Hooker 010–55–000 design is easily transformed into the Bush version by applying the coaster wheels evident in the RTA prior art, and simplifying the traditional styling elements. Moreover, Bush's hutch design as claimed in the '631 patent, may be formed by straightening the sides of the hutch in the Singer E453–865 computer desk/hutch, and adding two solid doors to enclose the upper righthand shelf. Lastly, the design for a printer stand claimed in the '096 patent may be created by isolating the two shelves forming the right half of the Singer hutch, or by applying the traditional styling from the Singer model to the standard shell for a printer stand as displayed in the O'Sullivan CT710 computer workstation.

Thus, under the first two factors of the obviousness inquiry, the comparison of the patents-in-suit to the prior art demonstrates the lack of innovation in the Bush designs. It is also significant that some of the closest prior art examples for each design, namely the Riverside 5132 entertainment center, the Hooker and Peters–Revington TV/VCR carts, and the Singer E453–865 computer desk/hutch, were not considered by the Patent and Trademark Office when it reviewed Bush's applications. Moreover, under the third obviousness factor, Stannard's declaration is compelling evidence that the designs would have been obvious at the time to a furniture designer of ordinary capability, and we find that Bush has failed to create a genuine dispute on this issue. Consequently, our analysis under the first three factors of the test, strongly indicates that

each of the Bush designs is obvious under 35 U.S.C. § 103 (1988).

2. Secondary Considerations: Commercial Success and Copying

■ Under the final, or secondary considerations, factor of the obviousness test, Bush has presented evidence of commercial success and copying. These are both secondary considerations which we must evaluate in determining whether a given patent's claims are obvious. *See Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed.Cir.1983). The rationale for this requirement is that such evidence may demonstrate that a design was actually not obvious at the time, but only appears so today as the effect of twenty-twenty hindsight. Nonetheless, any evidence of secondary considerations "must be carefully appraised as to its evidentiary value." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 908 (Fed.Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985) (discounting evidence of commercial success because the competitors may have found it cheaper to take licenses than to defend infringement suits).

■ Commercial success may indicate that a patent provided a new solution to a problem and tapped an unmet need, and consequently, that the claimed invention was not obvious at the time. Thus, to demonstrate non-obviousness through evidence of commercial success, the patent holder must show a nexus between the success of the product and the merits of the patented invention. *Avia*, 853 F.2d at 1564. Without such a connection, a court would be unable to conclude that the commercial success demonstrates the novelty and advances of the particular patented aspect of the commercial product. As a result, the evidence of commercial success would not provide a check on the exercise of twenty-twenty hindsight.

In the present case, Bush has presented evidence that the patented designs as embodied in the JAMESTOWN Collection were successful, but has failed to meet the nexus requirement. Although we agree with Bush that within the realm of RTA furniture, a consumer's decision to pur-

chase an item in the JAMESTOWN Collection rather than another RTA model would be based on the appearance of the traditionally styled design, this comparison is not sufficient. Since the purpose of considering evidence of commercial success in the first place is to assess whether the patented designs were actually not obvious in light of the prior art, the evidence of commercial success must provide a basis for comparing the patented designs to all the relevant prior art. Here, many of the closest prior art examples are traditionally styled setup pieces, such as the Riverside 5132 entertainment center, the Hooker 010–55–000 TV/VCR cart, and the Singer E453–865 computer desk/hutch. In competing against such traditionally designed setup furniture, however, the success of Bush's models is due to their vastly lower prices, and not to the aesthetics of their designs.

In short, although the success of Bush's JAMESTOWN Collection in competing against RTA designs in contemporary or country styles may be due to aesthetics, these RTA designs do not exhaust the prior art from which the patented designs must be distinguished. Rather, a crucial comparison in determining whether the patented designs were obvious is one with the traditionally styled setup furniture, and in this competition, Bush's success is due to its price, not to its design. Thus, the evidence of commercial success does not demonstrate nonobviousness.

 As an additional secondary consideration, Bush presents evidence that its designs were copied. Copying of a patented invention is evidence of non-obviousness. *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1000 (Fed.Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). As with commercial success, copying may demonstrate that the patented invention actually provided a new and creative approach to a previously unaddressed problem. Thus, several courts have relied on evidence of copying as one factor com-

pelling a conclusion that an invention was not obvious. *See, e.g., Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1564 (Fed.Cir.1988). On the other hand, evidence of copying does not preclude a finding of obviousness. Rather, when there is strong evidence of obviousness under the first three factors of the test, a court may conclude that the invention was obvious despite evidence of copying. *See Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768–69 (Fed. Cir.1988), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989).

Bush has proffered several types of evidence showing that its designs were copied. First, Bush offers a picture of O'Sullivan's discontinued model 79780 entertainment center which is very close in appearance to the '888 patent design. (D.I. 29A, Ex. 1C at A38).[2] Second, Bush has presented an O'Sullivan 1988 design order for an entertainment center, which refers the designer to this discontinued model and suggests several changes including "remove middle rail." (D.I. 29A, Ex. 12 at A117). Third, Bush has submitted O'Sullivan design orders for an "entertainment center" and a "TV/VCR cabinet" referring the designer to the Bush catalogue, and additional references to Bush pieces in O'Sullivan design orders for models which do not directly implicate the patents-in-suit. (D.I. 29A, Ex. 6–11 at A111–A116).

Fourth, Bush presents a catalogue for the Princeton Collection of a third company, Sauder Woodworking, which contains models very close in appearance to the Bush's '664 patent design for a TV/VCR cart and '530 patent desk design. (D.I. 29A, Ex. 1D at A41–A44). Lastly, Bush has submitted an O'Sullivan design order for a "knock-off Sauder unit" referring the designer to the Sauder model 2930 desk, which in turn looks almost exactly like the Bush '530 patent desk design. (D.I. 29A, Ex. 14 at A137). None of the evidence of copying specifically references the Bush '631 patent design for a hutch, or the

---

**2.** This model was discontinued before Bush's '888 patent had issued, and is therefore not itself accused of infringing the patent.

Rather, the model is simply offered as evidence of copying to demonstrate non-obviousness.

Bush printer stand as claimed in the '096 patent.

O'Sullivan counters this evidence by pointing out that it is common for furniture designers to refer to styles they have observed at trade shows to assist them in developing their own designs. Bush's own expert, Arto Szabo, agreed that this is a normal practice in the furniture industry. (D.I. 37, Ex. 1 at A27). Yet, while this fact may explain the references to the Bush catalogue contained in O'Sullivan's design orders, we agree with Bush that at a minimum, O'Sullivan's discontinued model 79780 entertainment center and the Sauder desk and TV/VCR cart are evidence that at least three of Bush's patented designs have been copied.

The remaining issue for determination is what weight should this evidence of copying be accorded. To answer this question, we must refer to the purpose that evidence of copying is intended to serve in our inquiry: to demonstrate that a design was not actually obvious at the time, but represented a new and creative design solution. As with the evidence of commercial success, however, Bush's evidence of copying has no probative value when we compare the Bush designs to the prior art designs in setup furniture. The fact that O'Sullivan and Sauder at one time chose the shortcut of copying one or more of the already well-known designs, now being used by their competitor in the RTA furniture business, does not indicate that Bush's designs were innovative as compared to the prior art setup pieces.

In addition, evidence of secondary considerations such as copying does not mandate a conclusion of non-obviousness, particularly when, as here, there is strong evidence under the other three factors of the test that the designs were actually obvious. *See Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768–69 (Fed.Cir. 1988), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989). Considering all four factors together, we find that the evidence of copying is not sufficient to overcome the compelling evidence of obviousness considered above. We conclude that

no genuine issue of material fact exists, and that O'Sullivan has shown by clear and convincing evidence that each of Bush's patented designs was in fact obvious under 35 U.S.C. § 103 (1988). As a result, each of the patents-in-suit is invalid.

## III. CONCLUSION

We find that summary judgment is appropriate on both grounds asserted by O'Sullivan. More specifically, we conclude that no rational trier of fact could find that any of the accused O'Sullivan furniture infringes any of Bush's patents, nor could a rational trier of fact fail to find that each of the five patents-in-suit is invalid for obviousness. We will therefore grant O'Sullivan's motion for summary judgment on both grounds.

